## BUCHANAN VS. CURTIS and others.

*Highway by dedication : Acceptance by town officers not necessary — Evidence as to dedication.*

1. No action by town officers is necessary to constitute a valid *acceptance* by the public of land dedicated for a highway; but travel thereon, to such an extent and for such a length of time as to show that the public convenience requires the road, is sufficient; and this time may be less than ten years. DIXON, C. J., dissents.
2. Proof of the owner's declarations after the opening of the road, and during the use by the public relied on as evidence of a dedication, is admissible to show that there was no intention to dedicate.

APPEAL from the Circuit Court for *Columbia* County. Trespass *quare clausum.* Answer, highway.

On the 6th of October, 1865, plaintiff owned a certain tract of land, of which the premises in dispute are a part. On the 9th of the same month he deeded an undivided half of said tract to one Bundy and one Gardner, and on the 16th of November following, they redeeded it to him, and he continued to own it until the commencement of this suit. During the period between October 9th and November 16th, 1865, while plaintiff, Bundy and Gardner owned it in common, a portion of said tract was surveyed and staked out into lots, and a road was surveyed and staked out, running from the south end of a highway, in the village of Rio, called Lincoln avenue, to a certain town line road. Some time during the winter following, the road was "cut out" and cleared at plaintiff's expense, and it was subsequently used by the public until some time in 1867 or 1868, when plaintiff built fences across it. It had never been worked by the path-master, nor recognized by any official action of the town supervisors. In May, 1868, the defendant *Curtis*, who was path-master, and the other defendants acting under

his direction, tore down the fences, which is the tres-
pass complained of. The only question at issue was,
whether the road had been dedicated and accepted as a
highway.*

Mr. Bundy, for the defendants, testified that plaintiff,
before this road was surveyed, "proposed to survey a
road" at that place, "and cut it out for the public.
It was cut out in December following. * * When we
got over to a track, he proposed to fill up the old track,
and make the travel come in on Lincoln avenue. I
don't know that the old track was filled. * * I have
a recollection that plaintiff either said or assented to the
saying that we would cut it out for a public road. I
think he made the proposition and we assented. It was
talked between us, and I had it in contemplation to
build on Lincoln avenue, and bring the post-office over
there. I never built or moved over there. This talk
was before we deeded [our undivided interest back] to
the plaintiff. There was nothing said about this during
the negotiations for and the deeding back to him. * *
It was the intention of myself and Gardner to go over on
Lincoln avenue, and to make it a business street. My
object was, to open this road and let the travel in on
that avenue." Mr. Gardner testified that the work of
surveying the road was done by himself, the plaintiff,
and one Topliff. "What plaintiff said was, that he
wanted a line run connecting Lincoln avenue with the
town line road. * * I was in copartnership with
Bundy at the time the road was talked of. There was
a talk that we should have a store in Lincoln avenue,
and the road was talked of to bring travel there. We
did not talk about moving over there until after the sur-
vey. I recollect but one conversation about it, and that
was on the avenue after the survey." One Rogers tes-
tified: "I had a conversation with plaintiff in October,

---

* The practical interest which will probably attach to cases of this character, in
this state, for some years to come, has induced the reporter to exhibit the evidence
in this action somewhat more fully than is usual in these reports.

1866.   He represented to me that he had opened a road to the prairie to bring the travel in on that street, because it would be the main traveled street to the prairie." On cross-examination he said: "He represented to me that Lincoln avenue would be the main street; that he had opened out a road to tap the prairie travel, and bring it in on Lincoln avenue." Against objection, this witness also testified, that, on the representation thus made to him by plaintiff, he bought lots on Lincoln avenue.   One Howe testified: "I was in with a load of wheat after this road was cut out, and plaintiff asked me which way I came in.   I told him I came in the usual way.   He said, 'I have got a road, or that road, cut out now.'   I told him I noticed the timber cut, but did not know whether it was hauled out.   He said he had had it hauled out, and just sent Robinson that way home, and wanted me to go that way, as he wanted to bring the travel in on that street.   He said it would make Lincoln avenue the principal street, by bringing in the travel on that street.   *   *   At the locating of the meeting-house site [on Lincoln avenue], plaintiff said it was a nice place for it, because that was the main street in town, and the people from the prairie would come in over it.   I can't say that any thing was said about *this* road at that time.   *   *   In front of Darrah's store, in summer or spring, something was said about cutting out the stumps.   Plaintiff said he had given the road, and cut the timber out, and he thought the people ought to turn out and grub it out.   *   *   In another conversation, plaintiff said he talked of putting up a stone block.   He said that opening that road through there was going to make it [Lincoln avenue] the street of the town."   On cross-examination the witness said he was quite confident, that, in the conversation at Darrah's store, plaintiff said he had *given* the road.   "I think he did say it was not a public road, and that the path-master had nothing to do with it."

One Taft testified that he helped cut out the road in question, and that plaintiff then told him "it was to have the travel from the prairie come through that way." On cross-examination, he testified: "I asked him if it was a laid out way, and he said he was doing it at his own expense." One Venable testified that in December, 1866, he had a conversation with plaintiff about Lincoln avenue. "He told me that would be the principal street, because he had opened a road connected with it. He said he had given a road across his own land for the purpose of bringing the travel that way. The object of opening it was to prevent the travel from going on East street; he said it used to go there." One Elliott testified that in August, 1866, plaintiff represented to him that Lincoln avenue would be the principal street. "He said he had opened a road to connect with the town line road, through his own land, for the purpose of bringing travel through Lincoln avenue and making it the principal street in town. * * Nothing further was said, only that he had opened the road himself, and built a bridge at his own expense, and wanted the people to grade it up so as to make it passable. This bridge is below his store on Lincoln avenue, and near the corner." One Bradley testified that he was town supervisor in 1865. "In the fall of that year, I was on section six [which embraces the land in dispute], and saw the plaintiff there. I saw him and Topliff going off with a chain. I told him we were warned out to lay a road. He asked me who got up the petition, and I told him I did not know. He said he did not want the supervisors to come there to lay out a road, and put the town to the expense; that he had Squire Topliff there, and that he was going to lay out the road and give it to the town; he was going to have quite a place there, and beat Doylestown." On cross-examination witness testified: "I can't tell what road the petition referred to. I never saw it. He said he had opened a road. * * He said he had given the road and was going to lay it out. That was all he said

on that subject." *Medhurst*, one of the defendants, testified: "I went to Rio in November, 1866, and located on Lincoln avenue. I had conversation with the plaintiff about the 1st of October. He told me he had cut a road from Lincoln avenue to the town line road, to take the travel coming from the prairie, and bring it in on Lincoln avenue, and he had given the road to the public for a public highway." Against objection, the witness also stated that he purchased two lots on Lincoln avenue as agent for his father. On cross-examination, he said: "I have given the language as near as I can. I am certain that he used the language, 'I have given this to the public for a public road.' The purchase and road were talked in the same conversation. We had two conversations, about twenty-four hours apart: both subjects were mentioned in both conversations. Plaintiff used the same language at both conversations, as near as I can recollect, and there was the same order of conversation between us. He said he had been to great or considerable expense in cutting out that road, but he thought he would sell his lots for enough more, because it would be the main business street. He said he had cut a road from the Portage to the town line road, tapping the travel on the town line road, and had given it to the public as a public road."

All the witnesses testified that the road, while open, was largely used by the public.

For the plaintiff, one Darrah was asked whether he had any conversation with plaintiff in the spring of 1866 concerning the jurisdiction of the supervisors over this road; but the question was ruled out. The witness then testified that he recollected a conversation between the above named witness Howe and the plaintiff, in the spring of 1866. "Plaintiff reminded me of a former promise that I would get some of the citizens to go and help improve the road. In the former conversations he spoke of the town officers having no authority over the road; I don't know whether he did in this." In his

own behalf, plaintiff testified, in substance, that he never told any of the defendants' witnesses, nor any other person, that he had "given" the road, or that it was to be "a public road," but merely that he had opened it to bring the travel that way. In reference to the conversation with Mr. Bradley, above mentioned, he testified that the petition to which Bradley referred, and the conversation in question, related to an entirely different road. He also testified that he had no recollection of ever having had any conversation with Mr. Bundy in reference to the road in dispute. "When this line was run, Topliff, Gardner and myself were present. * * There were tracks all across the land, and I spoke of filling up the tracks, and confining the travel to one track, and on to Lincoln avenue, to the stores. We intended to build on Lincoln avenue. They [Gardner and Bundy] did not build, and I did. Until I fenced up this land, it never had been fenced." He further testified that at the time of opening the road, he had conversations with one Scott and one Stewart (the latter in the presence of one Spaulding), in which he told them that the road was for temporary uses, and not designed for a public road. *Question:* "While the public were using that road for travel did you have any conversation with the people who traveled over it, in which you stated your intentions in regard to the road, or the reason why you let the people use it?" The question was ruled out, the court stating, however, that it would allow plaintiff to prove his acts and declarations "during the time of the opening, surveying and cutting out of the road." As to plaintiff's declarations while the road was making, Spaulding testified that plaintiff told him, or told Stewart in his presence, that it was to be cut out "for his own benefit." Stewart testified that plaintiff told him, in the presence of several other persons, that "this was not a public road, but a track for present convenience until there should

be some arrangements about roads." Scott testified
that plaintiff told him it was "for temporary accommo-
dation only."

The court gave certain instructions asked by the
plaintiff, but refused to charge the jury that an accept-
ance of the road by the public, to be valid, must be
"by some proper authority," or "by the town or road
authorities, by the expenditure of labor upon the road,
or in some other manner." It further instructed them
that if plaintiff had unequivocally declared, by his
words or acts, or both, that he intended to relinquish to
the public the right of traveling on this road, and the
public did in fact use it in such a manner as to show
their purpose to use it as a highway, then it was a
highway ; that upon the question whether plaintiff, "by
his declarations and acts, showed an intention to give the
road as a permanent public highway, at the time of cut-
ting it out," or induced the public to believe that he so
intended, they must find as they believed from all the
testimony.

Verdict for defendants ; new trial denied ; and plain-
tiff appealed from a judgment on the verdict.

*I. Holmes* and *G. C. Prentiss*, for appellant, argued
that mere use of a dedicated way the by public is not a
sufficient evidence of *acceptance*, because an obligation
on the part of the authorities to *maintain* the road must
be supposed to be embraced in the intentions of the
owner when he proposes the gift, and such use does not
impose such an obligation. *State v. Joyce,* 19 Wis. 92 ;
*Hobbs v. Lowell,* 19 Pick. 410 ; *Indianapolis v. McClure,*
2 Carter (Ind.) 147 ; *Blodgett v. Town of Royalton,* 14 Vt.
288 ; *Underwood v. Stuyvesant,* 19 Johns. 186 ; *Holmes
v. Jersey City,* 1 Beasley, 299 ; *Bowers v. Suffolk Man.
Co.,* 4 Cush. 332. Counsel also contended that the
decision in *Hanson v. Taylor* (23 Wis. 547), did
not apply here, because here the question is, whether
*mere use,* without other recognition of the road, and

*without any statute* affirming its legality, imposes on the town the duty of maintaining it.    2. Inasmuch as the user by the public for two or three years was a circumstance tending to show the fact of a dedication, and would be so considered by the jury without any specific instruction to that effect, the plaintiff should have been allowed to rebut that evidence by showing plaintiff's declarations while that user continued.    *Connehan v. Ford*, 9 Wis. 244; *Poole v. Huskinson*, 11 M. & W. 827.    3. The rights of the entire public in the alleged highway, and not those of one or two individuals in consequence of private purchases, are to be ascertained in this action; and the evidence as to those purchases should have been excluded.

*Cooke & Chapin* and *Emmons Taylor*, for respondents, as to the sufficiency of the proof of *acceptance* in this case, cited *Connehan v. Ford*, 9 Wis. 240; *Holdane v. Trustees, etc.*, 21 N. Y. 477; *State v. Nudd*, 3 Foster, 327; Washb. on Easements, 140; *Hanson v. Taylor*, 23 Wis. 547. As to the admissibility of the evidence as to purchases of lots in consequence of plaintiff's representations concerning this road, they cited *Holden v. Trustees, etc.*

DIXON, C. J.    This court is divided in opinion upon the question whether an acceptance by the officers of the town is necessary to constitute a highway by dedication.    My brethren are of opinion that such acceptance is not necessary, but that travel by the public, to such an extent and for such a length of time as to show that the public convenience and accommodation require the road, is sufficient for that purpose.    In support of this proposition they cite and rely upon the following authorities: *Hanson v. Taylor*, 23 Wis. 547; 21 N. Y. 474; 23 id. 64; 26 Barb. 634; 23 id. 123; 5 Bing. 477; [13 E. C. L. 45]; 36 Pa. St. 99; 20 id. 331; 46 N. H. 192; 19 Conn. 250; 29 id. 162.    On the other hand, I hold that acceptance by the proper officers of the town

is necessary, and· that mere travel or user by the public will not suffice for the purpose. I refer to my opinion in *Hanson v. Taylor*, and the authorities there cited, which, for convenience of reference, I here repeat: *State of Wisconsin v. Joyce*, 19 Wis. 90; 18 id. 118, ·129; 21 id. 609; 19 Johns. 186; 6 N. Y. 257; 14 Barb. 228; 16 id. 251; 37 id. 50; 36 Vt. 587; 27 id. 294; 13 id. 224; 14 id. 288; 19. Pick. 405; 3 Cush. 290; 4 id. 332; 8 Gratt. 632; 2 Carter (Ind.) 147; 33 Miss. 289; 29 Conn. 168; 1 Beasley (N. J.) 299; 2 R. I. 172. And if mere user by the public is, under any circumstances, to be regarded as an acceptance or evidence of an acceptance so as to bind the town, which I do not admit to be law in this state, I should still differ from my brethren as to the length of time of user required. I think, to be sufficient, it must be long user — twenty years at the common law, and ten years under our statute. R. S. ch. 19, § 85. And this I understand to have been expressly decided in several of the cases above referred to, while some others, it is freely admitted, seem to hold a different rule. I refer particularly to 46 N. H. 192, and authorities there cited, as showing the common-law rule upon this point; and also the rule which should be held under our statute in case the doctrine of acceptance by user is to prevail in this state. And I refer likewise to 1 Beasley, 299, upon the same point.

These remarks sufficiently dispose of all questions arising upon the instructions given, and those requested but not given. They show, that, in the opinion of the majority of this court, there was no error in either respect, while I am of the very opposite opinion.

But this case presents another question, upon which there is no division of opinion in this court. The court below refused to allow the declarations of the plaintiff, made after the way was opened, and after the alleged dedication, to go to the jury as evidence of the plaintiff's intention. Proof of such declaration made at the

time of the alleged dedication only, was admitted.   This, we think, was error.   It was expressly so ruled in *Proctor v. Town of Lewiston* (25 Ill. 153) ; and *Irwin v. Dixion* (9 How. [U. S.], 10), is a very strong case to the same effect.   In the latter case, the right of public way, claimed after a user of nearly fifty years by the public, was defeated by evidence of such declarations.   Such declarations are a part of the *res gestæ*.   Both the acts and declarations of the owner explanatory of his intention in permitting the public to use his land may be shown ; and if it appears that there was no intention to dedicate, then the public acquires no title by the user.

It follows that the judgment must be reversed, and a new trial awarded.

*By the Court.* — So ordered.